STEVENSON, Respondent, vs. COLUMBIA BANK OF LODI, Appellant.

*October 13—November 7, 1928.*

For the appellant there was a brief by *Hill, Thomann & Beckwith,* and oral argument by *D. V. W. Beckwith,* all of Madison.

For the respondent there was a brief by *Grady, Farnsworth & Walker,* and oral argument by *Dorothy Walker,* all of Portage.

The following opinion was filed November 7, 1928:

CROWNHART, J. The appellant's main contentions are (1) that Ferd Markgraf acted as the agent of the respondent in accepting the bonds in question for safe keeping, because, as a matter of law as well as of fact, the bonds in question never came into the possession of the bank; (2) the appellant bank is not liable to the respondent because Ferd Markgraf had no authority to accept for the bank the bonds of the respondent for safe keeping; and (3) the bank, if it is held to have obtained custody of the bonds, was a gratuitous bailee, liable for gross negligence only, of which it was not guilty.

The evidence is voluminous, but it is necessary to condense and abstract it in order to show whether or not the verdict of the jury is sustained.

During March, 1921, one T. F. Reynolds was cashier of the appellant bank, Robert Caldwell was president, Hugh Caldwell was one of the directors, Roy Gunderson and a Miss Thomas were clerks in the bank. The capital stock of the bank was 200 shares. In March, 1921, the Markgraf family purchased 90 shares of stock of the appellant bank from its cashier, Reynolds. About the same time Markgraf and his wife, who resided on a farm near Lodi, moved into the village of Dane, and took up their residence with the mother of Markgraf's wife, who was also the mother of the respondent. About March 21, 1921, Markgraf started

to work in the appellant bank, driving back and forth from Dane for that purpose, a distance of about five miles.

Markgraf, when he bought stock in the bank, asked Reynolds, who contemplated retiring as cashier, if he might secure the position of cashier. Reynolds replied that he would have to take his chance. Markgraf worked behind the counter in the bank after March 21st, and was observed by the directors of the bank in that position, who made no objection thereto. There is evidence that from April 1 to April 15, 1921, Markgraf made entries in the books of the bank under the direction of Reynolds and Miss Thomas. April 8th he made entries upon the certificates of deposit register. Prior to April 11, 1921, Reynolds spoke to Robert Caldwell about Markgraf becoming cashier, and told Caldwell he had sold his stock to Markgraf. Before the commencement of the instant action Robert Caldwell swore to a complaint of the bank in which it was alleged that at all times after April 1, 1921, until about September 15, 1924, Markgraf was cashier of the bank and actively engaged as such in said bank. Markgraf was formally elected cashier of the bank by the board of directors on the evening of April 11, 1921. His salary was fixed at $125 per month. Reynolds did not receive any salary for April, 1921, but Markgraf drew full salary for that month.

The respondent, who was a stenographer at Madison, Wisconsin, on April 7, 1921, was the owner of a certificate of deposit issued by the Bank of Wisconsin at Madison, for $2,000, dated April 7, 1921, which represented an inheritance from her father's estate. On April 8, 1921, she indorsed said certificate and delivered the same to Markgraf. Markgraf indorsed the same and deposited it in the appellant bank April 9, 1921, and thereupon issued two certificates of deposit to himself for $1,000 each, one of which was paid by the bank to Markgraf April 14, 1921, and one paid to him April 28, 1921.

April 11, 1921, before Markgraf was formally elected cashier, the respondent gave Markgraf, at Dane, money for deposit in appellant bank, which he deposited, and respondent received from him a certificate of deposit issued by the bank.

Prior to the time respondent indorsed her $2,000 certificate and gave it to Markgraf, he advised her that the appellant bank was selling bonds paying a good rate of interest, and respondent was induced thereby to convert her certificate of deposit into such bonds. She thereafter indorsed the certificate and gave it to Markgraf for that purpose. Markgraf, with the proceeds of the certificate, purchased a $1,000 bond issued by Armour & Company and a $1,000 bond issued by Swift & Company. The Armour bond was purchased by Markgraf from a bank at Dane April 9th and the Swift bond was purchased from De Wolf & Company of Chicago. The letter from De Wolf & Company accompanying the Swift bond was addressed to Markgraf in care of the appellant bank, and was found after the death of Markgraf among the correspondence of the appellant bank in the bank vault.

After the purchase of the bonds for respondent, Markgraf took them to her at her home in Dane and delivered them to her. The respondent made a memorandum of the numbers and other data from the bonds. Markgraf then advised respondent that the appellant bank held the securities of its customers for safe keeping, and thereby led her to give him the bonds for deposit in the appellant bank for safe keeping. Markgraf thereupon gave respondent two receipts for said bonds, one dated April 14th and the other April 15th. They had been written out before Markgraf delivered the bonds. These receipts were taken from a book of receipts, which book was the property of the appellant and kept by it in its vault. Other like receipts had been issued from the same book by Reynolds while he was cashier. The receipts were in Markgraf's handwriting, written with pencil, and carbon

copies retained in the book, as had been done by Reynolds. These receipts were introduced in evidence, and they contain the statement that the bonds, describing them, are received from the respondent for safe keeping; that "the bank does not agree to return the identical bonds, but bonds of the same issue and par value," and also the statement: "This bank will give the above described property the ordinary care given special deposits of this character, but beyond that will assume no further liability for loss by fire, theft, burglary, or other casualty." One receipt was signed by "Ferd Markgraf, Cashier;" the other by "Columbia Bank, by Ferd Markgraf, Cashier." The book of receipts was purchased by Reynolds, as cashier for appellant bank, and was kept in the vault of the bank from and after January, 1921, and was there found in 1924, after the death of Markgraf. It appears to have been a bank record accessible to the bank officials at any time. Another record, marked "Excelsior Journal, 1910," was kept in the bank, and it contained records of property of customers held by the bank for safe keeping. One page, headed "Securities held for customers, January 13, 1921," contained entries by Reynolds, Gunderson, and Markgraf. The following appeared thereon: "4-11-21, M-9775 Armour & Co. 1930—Ferd Markgraf." This is the same number as that of the Armour bond numbered in the receipt given respondent by Markgraf. The "Excelsior Journal" bears evidence that it was a bank record regularly used in the bank's business and accessible to the bank officials. The Armour bond was loaned by Markgraf to Gunderson when both parties were in the bank to be used as collateral upon which to borrow money in a bank at Madison. Gunderson returned the bond to Markgraf in the appellant bank.

The receipts given by Markgraf to respondent contain the statement: "Coupons as they become due are to be collected and proceeds credited to the owner's account or the bank's

check issued therefor." On July 16, 1921, the appellant bank remitted to the First Wisconsin National Bank of Milwaukee, among other items for collection, a coupon from the Armour bond of respondent. The remittance sheet showed the coupon was in favor of Anna Stevenson, the respondent. January 17, 1922, Markgraf sold the respondent's Armour bond to the First Wisconsin Trust Company, and received a draft drawn to him for the amount. This draft he indorsed to the De Wolf Company. In January, 1922, Markgraf informed the respondent that the appellant bank had a Wilson bond that was paying a higher rate of interest than the Armour bond, and advised an exchange, to which respondent consented. Thereafter Markgraf brought a Wilson bond to his home in Dane, where the respondent was at the time, and delivered it to her. Thereupon respondent requested Markgraf to take the Wilson bond to the appellant bank for safe keeping. Markgraf gave the respondent a receipt for the Wilson bond, which was drawn on a simple blank receipt form and was signed by Ferd Markgraf. The receipt gave the number of the bond as 15604, but the bond delivered to the respondent bore the number 708A, which she noted in a memorandum she made at the time. Respondent did not notice the difference in the numbers between the receipt and the memorandum she made until after this action was commenced. July 17, 1922, a remittance sheet of the bank shows a coupon from bond 708A, A. S. G. Stacker, owner. After respondent delivered the original certificate of deposit for $2,000 to Markgraf on April 8, 1921, for investment, she gave Markgraf, at Dane, on different dates, money for deposit in appellant bank and received certificates of deposit in said bank from Markgraf, signed by him as cashier, to wit: April 11, 1921, $31; July 30, 1921, $25; January 13, 1922, $50; January 13, 1923, $75; and January 18, 1923, $85. Respondent received interest on her bonds as it became due up to September 15, 1924, which was paid to her in cash by Markgraf. In the

early part of September, 1924, bank inspectors checked the account of the bank and found Markgraf had embezzled funds exceeding $40,000. September 15, 1924, Markgraf committed suicide.

During all the time Markgraf was cashier of the appellant bank he had almost exclusive charge thereof. He had as his assistant, Gunderson, but practically the entire management of the bank was in the hands of Markgraf.

It is claimed by the bank directors that Markgraf was not authorized to make loans of over $100 without approval. On this question the testimony is somewhat in conflict. When the bank was inspected by the banking department, Markgraf was nearly always in full charge and the directors were seldom called in. Markgraf was in the habit of receiving deposits from persons other than the plaintiff at Dane. Both Markgraf and Caldwell, president of the bank, on occasions transacted business of the bank away from the bank after banking hours. The bonds of customers held by the bank were kept in the vault of the bank by both Reynolds and Markgraf and were accessible to the banking officials. While Markgraf was cashier Gunderson was a member of the banking committee and knew the customers' bonds were kept in the vault. The by-laws of the bank require that a committee of three members appointed by the board of directors should supervise the bank and examine its affairs every three months. The bank, through its cashier and its president, dealt in bonds, purchased and made sales of bonds for its customers, and made profits thereby.

The foregoing facts are sufficiently established to justify a finding of the court or jury that they are true. The jury found that the bonds in question were placed by Markgraf in the vault of the bank. The finding of the jury in that regard is a fair inference from the facts established. It must be understood that Markgraf was an executive officer of the bank. He was placed in charge of the bank and did practically all the business of the bank. He was authorized

to act for the bank, and his transactions were inferentially approved by the board of directors of the bank. Under the circumstances, Markgraf's acts were the acts of the bank, and the bank is responsible therefor.

By sec. 221.04 (2), Stats., the bank was authorized to receive for safe keeping bonds and other securities. The evidence is conclusive that the bank did so. Coupons cut from respondent's bonds were transmitted by the bank for collection. The inference may well be drawn that the bonds were in the vault of the bank at the time. The records of the bank clearly indicate that the bonds were kept in the bank in the manner provided for securities of other customers. The receipts given respondent for the bonds, copies of which were kept in the vault of the bank, disclose the acceptance of the bonds by the bank for safe keeping. It is to be presumed that the banking committee, in checking the transactions of the bank, checked the bonds against these receipts and the "Excelsior Journal." We have no hesitation in sustaining the finding of the jury that the bonds were received in the vault of the bank for safe keeping.

As to the contention that Markgraf had no authority from the bank to accept the bonds of respondent for safe keeping, it would seem that the custom of the bank and the authority of the statute, sec. 221.04 (2), are sufficient to show the fallacy of the argument. The bank had statutory authority to receive the bonds for safe keeping, and, as we have seen, Markgraf was, for all practical purposes, the bank. He was the executive officer, and the management of the bank was practically left to his discretion. Besides, it must be inferred that the directors of the bank knew of the custom of the bank to keep securities of customers therein for safe keeping. They are presumed to know what the records of the bank disclosed. At least one of the directors was shown to have left property of his own in the bank for safe keeping. The receipt book kept in the vault of the bank had printed

on the outside, "Safe-keeping Receipts," and printed in the blank receipt was the following: "Received of —— for safe keeping." It is quite clearly established that the bank was the bailee of the bonds in question.

But it is argued that if the bank was a bailee it was only a gratuitous bailee, and liable to respondent only in case of gross neglect. The answer to this is that the contract of bailment, which was printed on the receipts issued, is plainly contrary to the appellant's contention. That contract was to give respondent's bonds the ordinary care given special deposits of this kind. The receipt specified that the bonds were received for safe keeping. What is ordinary care in regard to a bank in safe keeping securities? Can it be doubted that the contract imposed upon the bank the duty of keeping the securities in the vault of the bank, to employ honest employees to guard the same, and not itself, by its chief executive officers, embezzle the property? Here there can be no reasonable contention that the bank exercised ordinary care. The bank itself, through its chief executive officer, converted the bonds, and in such a case it cannot be heard to say that it exercised the ordinary care provided in the contract.

Neither do we think that the contract of bailment was gratuitous. The receipt provided that the bank did not agree to return the identical bonds, but bonds of the same issue and par value, which simply means that the bank was permitted to deal with these bonds for the purpose of making a profit to itself, and was only obliged to return bonds of the same issue and of the same par value. This was an advantage to the bank and was ample consideration for the bailment. Further, we think that the fact that the customers will be attracted to the bank to make deposits therein by such accommodations was sufficient consideration to take the contract out of a gratuitous bailment.

The appellant assigns errors in the special verdict and in the instructions of the court. We have gone over these mat-

ters with care, and conclude that there are no prejudicial errors in the record.

We recognize that the result of this decision is to put a very considerable burden upon banks in the conduct of their business. However, banks hold very responsible positions of trust, and it is not expecting too much of them to protect in every reasonable way the property of their customers committed to their care. They select their own servants and officers, and the law holds them responsible for the acts of their agents within the range of their authority. The bank may, and usually does, protect itself by bonding its employees. But it should do more. It should very carefully supervise such agents and make frequent inspections, full and complete, to guard against dishonesty or carelessness of its agents. The bank should also understand that an agent not only has the authority actually given him under the resolutions of the directors, but the bank may be bound, under some circumstances, by the agent's apparent authority. In no other way may a confiding public be protected.

*By the Court.*—The judgment of the circuit court is affirmed.

A motion for a rehearing was denied, with $25 costs, on January 23, 1929.